IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF OKLAHOMA

LA'MEIA SOLOMON,                    )
                                   )
    Plaintiff,                     )
                                   )        CIV-22-359-SLP
    v.                             )
                                   )
DOUGLAS A. COLLINS, Secretary,     )
U.S. Department of Veterans Affairs, )
                                   )
    Defendant.                     )

## O R D E R

Before the Court is the Motion for Summary Judgment [Doc. No. 54] on behalf of Defendant Douglas A. Collins, Secretary of the United States Department of Veterans of Affairs (the Secretary).[1]  Plaintiff La'Meia Solomon has responded [Doc. No. 65], and the Secretary has replied [Doc. No. 70].  For the reasons that follow, the Secretary's Motion is GRANTED.

## I.    Background

Ms. Solomon is a former employee of the United States Department of Veterans Affairs who brings claims for: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; and (2) disability discrimination and failure to accommodate in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*.  Am. Compl. [Doc. No. 7] at 13-18.[2]  Ms. Solomon is an African American

---

[1] The Motion was filed by Defendant Denis R. McDonough, but the current Secretary, Douglas A. Collins, has been substituted in his place.  *See* Fed. R. Civ. P. 25(d).

[2]  Citations to the record reference the Court's CM/ECF pagination.

woman with physical and mental disabilities, including generalized anxiety disorder, panic, claustrophobia, hypertension, post-traumatic stress disorder, conduction disorder of the heart, hypokalemia, major depression, chronic upper respiratory infections, and anemia. *Id*. ¶ 41. Many of her factual allegations relate to events surrounding attempts to obtain leave or permission to work remotely during the initial months of the COVID-19 pandemic. *See id.* ¶¶ 37-99. The Secretary moves for summary judgment on all claims brought by Ms. Solomon.

## II. <u>Governing Standard</u>

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Koel v. Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1333-34 (10th Cir. 2025) (quoting *Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 551 (10th Cir. 2000), then citing Fed. R. Civ. P. 56(c)). A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is only material if it "might affect the outcome of the suit under the governing law." *Id.* (citation omitted). The court reviews the record in the light most favorable to Ms. Solomon to determine whether there is a genuine issue of material fact. *Koel*, 128 F.4th at 1333-34.

III.    **Undisputed Material Facts**[3]

Ms. Solomon is an African American woman who is disabled.  Prior to working in Oklahoma City and the events at issue, she worked for the Veterans Health Administration as a GS-8 Budget Technician in Alexandria, Louisiana.  She received "outstanding" or "excellent" performance reviews in 2017 and 2018 while in her role in Louisiana.  *See* Pl's Perf. Revs. [Doc. No. 65-3].

On October 27, 2019, Ms. Solomon was hired as a GS-9 Budget Analyst in the Fiscal Service department of the Oklahoma City Veterans Health Care System (OKC VA).  The position for which she was hired had the potential for promotion to a GS-11 position after one year if she had satisfactory performance reviews.  A GS-9 and GS-

---

[3] Included here are only the material facts supported by the record and not genuinely disputed in the manner required by Fed. R. Civ. P. 56.  Most of Ms. Solomon's responses to the Secretary's undisputed material facts lack any citation to evidence in the record and instead rely on unsubstantiated assertions by counsel.  *See* Resp. [Doc. No. 65] at 7-24.  The same is true for many of the assertions in Ms. Solomon's statement of material facts.  *See id.* at 25-27.  As such, the vast majority of Ms. Solomon's factual contentions are not properly supported under Federal Rule of Civil Procedure 56(c)(1) and Local Civil Rule 56.1(d), and the Court deems those facts admitted. *See* LCvR56.1(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("[T]he nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" (citing Fed. R. Civ. P. 56(e))); *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

Where she does cite to evidence, Ms. Solomon rarely includes a pin cite or other information to help identify the pertinent portion of the exhibit, and many of the exhibits she cites are either wholly unrelated (or only loosely related) to her factual contention.  *See* Resp. [Doc. No. 65] at 7-27.  This too is insufficient to support the assertions of counsel.  *See Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1100 n. 21 (10th Cir. 2025) (finding summary judgment was proper where the nonmoving party's citations to the record "fail to match the assertion, contain only generalized and conclusory statements, or require one inference too many to adequately support the assertion.").  The Court does, however, include the few facts from Ms. Solomon's Response that are properly supported.

11 Budget Analyst have similar responsibilities, but a GS-9 position involves more supervision and guidance.

When she was hired, Ms. Solomon joined two other Budget Analysts, both of whom are African American. An individual named Travis Scott was the Chief Financial Officer and served as Ms. Solomon's first-line supervisor. Tina Harmon was the Chief Fiscal Officer and served as her second-line supervisor. Mr. Scott provided in-person training to the Budget Analysts, although he often changed his mind on how he expected things to be done. *See* Solomon Dep. [Doc. No. 65-7] at 3. In addition to in-person training, Budget Analysts also worked together and trained as a team. Solomon Dep. [Doc. No. 54-4] at 12.[4]

### A. Initial Telework Requests

In response to the COVID-19 pandemic in early March of 2020, the VA began sending guidance to employees about screening procedures and what to do if they were concerned about getting sick. On March 13, 2020, Ms. Solomon emailed Mr. Scott expressing concern about being exposed to COVID and asking to telework. Ms. Solomon then took her equipment from Fiscal Service and went home. Shortly thereafter, Mr. Scott accused Ms. Solomon of stealing the computer equipment and told

---

[4] Ms. Solomon attempts to raise a fact dispute regarding training, but her citations to the record do not support her statements. She primarily cites to "Ex. 11: ROI." Resp. [Doc. No. 65] at 7-8. It is unclear what "ROI" refers to, and Ms. Solomon's eleventh exhibit is a "Telework Request/Agreement." *See* [Doc. No. 65-11]. The Court declines to search the record for evidentiary support Ms. Solomon fails to properly refer to. *See Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992) ("In the absence of [a] specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury."). In any event, Ms. Solomon makes no legal argument regarding failure to train, so this issue is immaterial.

her she should study appropriations law.  *See* Solomon Aff. [Doc. No. 65-19] at 3; *see also* Scott Decl. [Doc. No. 54-1] at 2.[5]

Due to the pandemic, guidance regarding employee leave within the VA changed on a near daily basis in March of 2020.  In an effort to prioritize clinical services at the facility, and in light of concerns regarding equipment and bandwidth capabilities, the OKC VA initially required all telework agreements to receive approval from Ms. Harmon and OKC VA Director Kristopher Vlosich.  On March 16, Ms. Harmon directed Mr. Scott to have his employees complete the necessary paperwork for ad hoc telework agreements.  To that end, Mr. Scott worked with Ms. Solomon to prepare the paperwork for her telework request.[6]

Mr. Scott sent Ms. Solomon guidance from the national VA on March 18, and they had a phone call on March 19.  During that call, Mr. Scott walked Ms. Solomon through the process of completing the ad hoc telework agreement.[7]  *See* Solomon Dep. [Doc. No. 54-4] at 5.  In connection with that process, Ms. Solomon and Mr. Scott signed the necessary ad hoc telework forms on March 17, 18, and 19.  Ad hoc telework

---

[5] Ms. Solomon refers to her affidavit, where she attests that "IT" approved her taking computer equipment for telework on March 23, 2020.  Solomon Aff. [Doc. No. 65-19] at 3.  But that date is multiple days after the March 17 date that Ms. Solomon asserts (without evidence) she took the equipment home.  *Compare id.*; *with* Resp. [Doc. No. 65] at 10.

[6] Ms. Solomon asserts Mr. Scott immediately "put up barriers and failed to follow the [VA] directives regarding leave. . ." Resp. [Doc. No. 65] at 26.  But she cites only to "Ex. 18"—a group of messages between Mr. Scott and another VA employee in November of 2020 and March of 2021.  *See id.*; *see also* [Doc. No. 65-18].  Those messages do not support her contention.

[7] This is the same phone call where Mr. Scott told Ms. Solomon to study appropriations law.  *See* Scott Decl. [Doc. No. 54-1] at 2.

agreements became eligible for approval on March 24, and Ms. Solomon's agreement was approved by Ms. Harmon and Director Vlosich on March 26.

Prior to that approval, on March 16, 20, and 23, Ms. Solomon notified Mr. Scott that she had been running a fever and took time off work. Due to the quickly changing leave guidance, Mr. Scott and Ms. Harmon consulted with HR Specialist Stephanie Myers to ensure Ms. Solomon's leave was correctly categorized. By March 23, after confirming its accuracy with OKC VA Associate Director Paul Gregory, Mr. Scott and Ms. Harmon advised Ms. Solomon of the relevant leave categories she had available for use. Between March 16 and March 26, Ms. Solomon used 44.5 hours of Leave Without Pay, 12.75 hours of Annual Leave, and 12.5 hours of Sick Leave.

On April 17, 2020, Mr. Scott recommended reprimanding Ms. Solomon for failure to follow VA policy because she recorded their March 19 phone call without his knowledge and then shared segments of that call with OKC VA leadership in violation of "VHA Directive 1078(1)." *See* Scott Decl. [Doc. No. 54-1] at 2. Ms. Solomon also posted segments of the recording on Facebook. *Id.*; *see also* Harmon Decl. [Doc. No. 54-5] at 3. Ms. Harmon independently reviewed the proposed reprimand, the evidence file, and Ms. Solomon's response. Harmon Decl. [Doc. No. 54-5] at 3-4. Ms. Harmon issued the reprimand. *Id.* at 4.[8]

---

[8] Ms. Solomon made initial contact with the Equal Employment Opportunity (EEO) Office on March 31, 2020. She also states that she contacted "Rep. Cole's office concerning the VA's failure to provide her telework on May 13, 2020." Resp. [Doc. No. 65] at 27. But the exhibit she cites to, "Ex. 14," in no way supports or relates to that contention, and the same is true for her next contention that "Stephanie" (presumably Ms. Myers) provided a "different timeline of events." *See id.*; *see also* [Doc. No. 65-14].

Mr. Scott called Ms. Solomon on his personal cell phone on May 15, 2020. There is no dispute that Mr. Scott called Ms. Solomon a "monkey" during their phone call and further stated: "you people always trying to get something for nothing, you are not going to win." Mr. Scott subsequently told Ms. Harmon that he called Ms. Solomon on his personal cell phone, and Ms. Harmon verbally reprimanded him because he had been issued a VA phone.[9] Harmon Decl. [Doc. No. 54-5] at 4-5.

### B. Reasonable Accommodation Process

On March 26, 2020, Mr. Scott contacted the OKC VA Reasonable Accommodation Coordinator, Theresa Dirden, stating that Ms. Solomon may be a candidate for a reasonable accommodation. Dirden Decl. [Doc. No. 54-11] at 1. Ms. Dirden contacted Ms. Solomon, but Ms. Solomon did not want to have a reasonable accommodation at that time. *Id.* However, on April 17, Ms. Solomon decided to seek a reasonable accommodation, and Ms. Dirden sent her a packet to fill out.[10] *Id.*

Ms. Solomon returned the reasonable accommodation packet to Mr. Scott on May 12. She requested accommodation due to high risk for COVID and "due to formal EEO Complaint process against current supervisor and command chain . . . These (sic) environment is causing additional physical and mental illness." [Doc. No. 54-11] at

---

[9] As part of a workers compensation claim by Ms. Solomon, another VA employee named Krista Jablonski stated she did not "believe any disciplinary action was taken" on Mr. Scott because they could not find anything that prohibited him from using his personal cell phone. *See* [Doc. No. 65-29] at 1.

[10] Leave pursuant to the Families First Coronavirus Response Act (FFCRA) was nationally available on April 22, 2020, but it was not available at the OKC VA until May 1, 2020. Ms. Meyers provided Ms. Solomon directions on how to request FFCRA leave by May 7, 2020.

13.[11]   On May 20, Ms. Solomon followed up with medical documentation from her doctor recommending remote work to avoid COVID exposure.  Her doctor also noted that she "may be better of (sic) removed from current service chain" due to "extreme stress reaction/anxiety when approached or needs to interact with her current supervisor." [Doc. No. 54-11] at 20.

The same day, Ms. Dirden submitted Ms. Solomon's accommodation request to Chief Nurse Kerri Craft, the decisionmaker for COVID-related accommodation requests.  On May 29, 2020, Ms. Dirden sought additional documentation from Ms. Solomon.  In response, Ms. Solomon submitted additional documentation from her doctor that stated she had been advised to continue "social isolation due to her chronic medical conditions and inability to tolerate personal protective equipment (PPE) secondary to her Anxiety disorder." [Doc. No. 54-11] at 65.[12]

On June 1, Ms. Solomon requested 216 hours of Weather and Safety leave, but that amount surpassed what either Mr. Scott or Director Vlosich could approve.  Ms. Solomon alternatively requested 216 hours of Advanced Leave, but she had zero hours of Annual or Sick Leave left, so her request for Advanced Leave was denied.

On June 2, Ms. Craft emailed Ms. Solomon about the scope of her

---

[11] As noted, Ms. Solomon initiated contact with an EEO counselor on March 31, 2020.  She filed a formal complaint of discrimination on May 12, the same day she submitted the reasonable accommodation packet.

[12] Ms. Dirden also asked Ms. Solomon to complete a telework agreement in association with her accommodation request, but Mr. Scott returned it because the form was a duplicate of the ad hoc telework agreement previously authorized.

accommodation request.[13]  Ms. Solomon responded that her accommodation request was for both telework and reassignment.  Ms. Dirden and Ms. Craft told Ms. Solomon that reassignment was not part of the reasonable accommodation process, but rather the EEO process.  On June 8, Ms. Craft approved Ms. Solomon's reasonable accommodation request for telework only.

To finalize the accommodation process, Ms. Craft provided Ms. Solomon with "VA Form 0857f" for signature and an accompanying VA form to initial.  Those forms were to indicate that an interactive process had been held and that Ms. Solomon was accepting the accommodation.  Ms. Craft was the decisionmaker for hundreds of accommodation requests during COVID, and she always secured a signature as part of the process.  The same day, Ms. Dirden also asked Ms. Solomon to complete a corrected telework agreement form called "LEAF Request #479."

Ms. Solomon refused to accept the accommodation for telework alone and continued to request reassignment as part of her request for reasonable accommodation. Ms. Dirden explained to Ms. Solomon that if working in Fiscal Services was causing her medical condition, that would need to be stated on the medical documentation.  *See* [Doc. No. 54-11] at 42.  On June 15, July 30, and August 10, 2020, Ms. Dirden continued to instruct Ms. Solomon to complete her VA forms and corrected LEAF Request #479.[14]

---

[13]  Without consent to record calls, Ms. Solomon would only communicate via email.

[14]  On July 1, while the interactive process was taking place, Ms. Solomon requested 96 hours of Advanced Sick Leave.  Director Vlosich approved 40 such hours, which was the total amount

On August 10, Ms. Solomon's accommodation file was flagged for administrative closure if she did not respond by August 13. She submitted a new doctor's note on August 11, followed by two more on August 18. The August 11 note recommended that she "return to work" under different supervision. *See* [Doc. No. 54-11] at 86. The August 18 notes, on the other hand, indicated that she must be allowed to work from home (or could not work at all) because she was at a high risk for COVID and related complications, and she could not tolerate personal protective equipment. *Id.* at 93, 95.

Ms. Dirden reopened Ms. Solomon's file upon receipt of the new doctor's notes. On August 21, Ms. Dirden reminded Ms. Solomon to sign VA Form 857f to complete the process, explaining that she had no way of documenting acceptance of a reasonable accommodation for telework without that form. Although Ms. Solomon did not sign the form, Ms. Dirden was able to complete her reasonable accommodation case without the signature by obtaining permission to bypass the VA form requirement by August 25, 2020. Dirden Decl. [Doc. No. 54-11] at 117.[15]

Nevertheless, there were issues with Ms. Solomon's corrected telework agreement, LEAF Request #479, that were never resolved. Ms. Solomon resubmitted

---

available to be earned by the end of the calendar year. By August 14, Ms. Solomon had used all her available FMLA leave.

[15] Ms. Solomon repeatedly asserts these forms were not required, but the only evidence she cites to is her "Ex. 32." *See, e.g.,* Resp. [Doc. No. 65] at 21. Exhibit 32 appears to be a notice of an arbitration award for a group of individuals that included Ms. Solomon, with options for a remedy she could choose. *See* [Doc. No. 65-32]. It is wholly unclear how this supports the assertions of Ms. Solomon's counsel.

that document on August 12, but it contained the same errors Ms. Dirden previously identified.  Mr. Scott, Ms. Dirden, and Associate Director Gregory identified necessary corrections.  On August 28, Associate Director Gregory made five requests for Ms. Solomon to deselect the "ad hoc" option.

On September 18 and October 19 of 2020, Ms. Solomon submitted LEAF Request #479 with comments that would have populated for Mr. Scott's signature once printed.  Those comments included accusations by Ms. Solomon that Mr. Scott harassed and retaliated against her.  In the October 19 version, the comments stated that her telework agreement was for a "permanent" medical disability.  In each instance, Mr. Scott returned LEAF Request #479 and asked that the comments be removed.

On October 22, 2020, Ms. Dirden asked Ms. Solomon to align the comments on LEAF Request #479 with her reasonable accommodation request and resubmit the information.  Ms. Solomon made those corrections and resubmitted her request, and Mr. Scott certified the LEAF Request the same day.  Nevertheless, as of October 28, 2020, Ms. Solomon had not signed LEAF Request #479.

## C. Removal Process

On September 17, 2020, Associate Director Gregory proposed Ms. Solomon's removal from federal service based on four Charges: Failure to Follow Instructions, Absence Without Leave (AWOL), Lack of Candor, and Conduct Unbecoming of a Federal Employee.  *See* Removal Proposal [Doc. No. 54-6] at 71.  The letter first listed five instances of failure to follow instructions to sign the VA reasonable

accommodation forms and LEAF Request #479, in addition to four accompanying AWOL charges. *Id.* at 71-72.[16]

As to the Lack of Candor charge, the letter described instances of Ms. Solomon posting live videos of herself on Facebook in public in July and September of 2020, in addition to photographs of her wearing a mask, even though her reasonable accommodation paperwork indicated that she could not be in public and could not wear personal protective equipment. *Id.* at 72-73. Ms. Solomon was removed from federal service on November 2, 2020. Director Vlosich reviewed and approved the removal.

### D. Applications for Other Job Opportunities[17]

In January of 2020, Ms. Solomon sent her resume to a VA human resources specialist to apply for a Public Affairs position, who forwarded the resume to another HR Specialist named Nancy Wilson. *See* Wilson Dec. [Doc. No. 54-7] at 1. A reorganization was underway at the time, and the position was ultimately abolished and never filled. *See id.* Ms. Solomon also applied for a Construction Control Representative position between April 27, 2020 and May 8, 2020. But her resume did not indicate any of the specialized experience identified for the position, and she had never worked in construction control. On June 12, 2020, Ms. Wilson notified Ms. Solomon she was not selected: OKC VA leadership selected a temporary hire instead.

---

[16] Ms. Solomon again vaguely asserts that the "document" she was instructed to sign was "optional," but she cites no evidence in support of that assertion. *See* Resp. [Doc. No. 65] at 22.

[17] Although included by the parties and mentioned here, Ms. Solomon does not connect these facts to any legal argument regarding failure to hire or promote, or as evidence relevant to an inference of discrimination.

IV.    **Discussion**

The Secretary first asserts that certain discrete acts of discrimination claimed by Ms. Solomon are unexhausted.  *See* Mot. [Doc. No. 54] at 25-29.  His primary argument, however, is that Ms. Solomon cannot carry her burden to establish a prima facie case of race or disability discrimination, nor can she show that the legitimate, nondiscriminatory reasons for his decisions were pretextual.  *Id.* at 29-45.[18]  Finally, the Secretary asserts that Ms. Solomon's claim for failure to accommodate lacks evidentiary support.  *Id.* at 45-48.  The Court briefly addresses exhaustion before proceeding to Ms. Solomon's discrimination claims and then failure to accommodate.

### A. Exhaustion

Where a plaintiff alleges multiple discriminatory acts, "each discrete incident of such treatment constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110–13 (2002)).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 113.  This "rule is equally applicable . . . to discrete claims based on incidents occurring *after* the filing of Plaintiff's EEO complaint." *Martinez*, 347 F.3d at 1210-11.[19]

---

[18] On this point, the Secretary principally contends Ms. Solomon is unable to show any inference of race or disability discrimination associated with any action by the OKC VA.  *See id.* at 36-39.

[19]  Hostile work environment claims work differently.  *See Aman v. Dillon Companies, Inc.*, 645 F. App'x 719, 724 (10th Cir. 2016) ("'[A]s long as an act contributing to a hostile work environment took place' within the limitations period, 'a court may consider the complete history of acts comprising that hostile work environment.'" (quoting *Duncan v. Manager, Dep't of Safety*,

Ms. Solomon filed a formal EEO complaint on May 12, 2020, referencing twenty-five events. She amended her complaint to add a twenty-sixth event on August 27, 2020. The VA EEO Office accepted for investigation twenty-five events occurring between January 15, 2020 and June 12, 2020, in addition to the twenty-sixth event on August 17, 2020. *See* Not. of Am. [Doc. No. 54-13] at 27. Among those, only ten were accepted for investigation as "independently actionable" claims: events 5, 7, 9, 18, 19, 21, 23-26. *Id.* The other fifteen events were accepted for investigation only as to an "overall claim of harassment[.]" *See id.*

The Secretary argues that Ms. Solomon has attempted to raise unexhausted claims in discovery based on events that occurred after those presented to the EEO Office. Mot. [Doc. No. 54] at 28. This includes claims that the VA investigated Ms. Solomon's private life, claims regarding testimony occurring before the Merit Systems Protection Board (MSPB), and allegations regarding workers' compensation. *Id.* The Secretary further contends that the fifteen claims the EEO Office did not accept as "independently actionable" are unexhausted for purposes of her claims of race and disability discrimination. *Id.* at 28-29.

Ms. Solomon makes no argument regarding the latter group of claims not accepted as independently actionable, and she appears to concede the former category of new claims raised in discovery are unexhausted. *See* Resp. [Doc. No. 65] at 32-36

---

397 F.3d 1300, 1308 (10th Cir. 2005))). Although she references case law regarding hostile work environment in her Response, *see* [Doc. No. 65] at 33, 35-36, Ms. Solomon did not bring a hostile work environment claim in this action. *See* Am. Compl. [Doc. No. 7] at 13-18.

(referring to the former category as "not exhausted" but arguing they may be considered as "background evidence"). As such, Ms. Solomon has waived any claims regarding the former category and forfeited any claims regarding the latter. *See Sprint Nextel Corp. v. Middle Man, Inc.*, 822 F.3d 524, 531 (10th Cir. 2016) ("Forfeiture is failure to timely assert a right; waiver is the intentional relinquishment or abandonment of a known right."). In any event, Ms. Solomon does not connect any of these claims to any adverse employment action in her arguments regarding her race and disability discrimination, so it is unclear how they would be material anyway. *See id.* at 36-41.

**B. Discrimination Claims**

The federal-sector portion of Title VII provides that "all personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). The Rehabilitation Act prohibits the federal government from discriminating against an "otherwise qualified individual with a disability." 29 U.S.C. § 794(a). The Rehabilitation Act expressly incorporates the standards applied under the Americans with Disabilities Act (ADA). *See id.* § 794(d).

To survive summary judgment on a race discrimination claim, "a plaintiff must present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). The same is true for a disability discrimination claim. *See Ford v. Brennan*, No. 21-4086, 2023 WL 5606233, at *4 n. 7 (10th Cir. Aug. 30, 2023) ("Without direct

evidence of discrimination, claims under the Rehabilitation Act are subject to the *McDonnell Douglas* burden-shifting framework.").[20]  Although not entirely clear, Ms. Solomon appears to argue she has both direct and indirect evidence of race discrimination and indirect evidence of disability discrimination.  *See* Resp. [Doc. No. 65] at 31-32, 36-40.

### i.   Direct Evidence

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons" and proves "the existence of a fact in issue without inference or presumption."  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (internal quotation marks and citations omitted).  This evidence is "usually impossible to obtain."  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011) (citation omitted).  Generally, "[c]omments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs."  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). And "discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision."  *Id.*

---

[20] Ms. Solomon argues "many Circuits, including the Tenth Circuit, are questioning the use of the [*McDonnell Douglas*] framework."  Resp. [Doc. No. 65] at 28-29.  She quotes various concurrences from judges on the Tenth Circuit Court of Appeals. *See id.* at 29-30.  The Court need not delve into a lengthy discussion of those concurrences because *McDonnell Douglas* still provides the governing framework for Ms. Solomon's claims, as stated by the Tenth Circuit just over a month ago.  *See Jenny v. L3Harris Techs., Inc.*, 144 F.4th 1194, 1198 (10th Cir. 2025) ("We analyze disability-based employment-discrimination . . . claims under the *McDonnell Douglas* burden-shifting framework.").

Ms. Solomon points to Mr. Scott's comments on the May 15 phone call where he called her a "monkey" and said "you people always trying to get something for nothing, you are not going to win." Resp. [Doc. No. 65] at 36. But she fails to establish a direct connection between Mr. Scott's discriminatory statements and any adverse employment action. *See id.* She argues that race was "a contributing factor to her termination," but she offers no argument, let alone any evidence, connecting Mr. Scott's racist comment to her termination about six months later. *See Ford*, 45 F.4th at 1214 (finding no direct evidence of discrimination despite racist comments by a company vice president because the plaintiff "identified no evidence that he refused to promote her because of her race or gender.").

Mr. Scott made those discriminatory comments during the phone call on May 15, but it was Associate Director Gregory who proposed Ms. Solomon's removal four months later, and Director Vlosich approved her removal nearly two months after that. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (finding no direct evidence of discrimination in part because a supervisor's comments about the plaintiff's pregnancy were made "about a month before terminating" the plaintiff, so there was no temporal proximity). Moreover, none of the charges that resulted in Ms. Solomon's removal directly relate to Mr. Scott's comments on May 15, and she does not contend otherwise. *See* Removal Proposal [Doc. No. 54-6] at 71-72; *see also* Resp. [Doc. No. 65] at 36. Although Mr. Scott's comments "reflect an animosity towards [a] protected group," they do not "demonstrate[] on [their] face that the decision-maker acted on this nefarious motive." *Fassbender*, 890 F.3d at 883–84 (internal quotation

17

marks and citation omitted).  Accordingly, the Court proceeds to consider whether Ms. Solomon has established indirect evidence of discrimination.

### ii.  Indirect Evidence Under *McDonnell Douglas*

The *McDonnell Douglas* test involves three steps.  At the first step, the plaintiff must "raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Bekkem*, 915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).  If the plaintiff establishes a prima facie case, the burden "shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* (citation omitted).  If the employer makes this showing, the burden shifts back to the plaintiff to demonstrate "that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (citation omitted).  A plaintiff "can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'" *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1211 (10th Cir. 2010).

A prima facie case of race discrimination requires Ms. Solomon to show: (1) she belongs to a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.  *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).  For a prima facie case of disability discrimination, Ms. Solomon must show that she: "'(1) is a disabled person as defined by the ADA; (2) is qualified .

. . to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability.'" *Green v. U.S. Anesthesia Partners of Colorado, Inc*., No. 22-1319, 2023 WL 7015660, at *3 (10th Cir. Oct. 25, 2023) (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011)). "[T]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Goodson v. DeJoy*, No. 22-1338, 2023 WL 4782947, at *6 (10th Cir. July 27, 2023) (quoting *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969-70 (10th Cir. 2017)).[21]

Upon consideration of the parties' arguments and the undisputed material facts, the Court agrees with the Secretary that Ms. Solomon has not met her burden to set forth a prima facie case of race or disability discrimination. Although her burden is not heavy, she neither cites nor refers back to any evidence whatsoever in her arguments, and she includes no legal authority beyond a general discussion of the elements of a prima facie case. *See* Resp. [Doc. No. 65] at 36-39. Instead, Ms. Solomon relies on unsupported assertions of counsel. *See id.*

In any event, the Court agrees with the Secretary that Ms. Solomon has not shown any adverse employment action occurred under circumstances that give rise to

---

[21] The parties dispute whether a federal sector employee such as Ms. Solomon must show a "significant" change in job duties, responsibilities, or working conditions after *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). The Court need not decide that issue because Ms. Solomon's prima facie case fails for a different reason: lack of evidence suggesting an inference of discrimination in relation to any adverse action she references. And, more importantly, Ms. Solomon makes no effort to show pretext.

an inference of discrimination. As to race discrimination, Ms. Solomon only references her removal and Mr. Scott's discriminatory comments. *See* Resp. [Doc. No. 65] at 36-37. She makes no effort, however, to connect Mr. Scott's comments to her proposed removal by Associate Director Gregory or the ultimate decision by Director Vlosich nearly six months after the comments. *See id.* As such, the comments alone are insufficient to create an inference of discrimination. *See Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012) ("[A]ctions or remarks made by *decisionmakers*" may give rise to an inference of discrimination (internal quotation marks and citation omitted) (emphasis added)); *see also Baltazar v. Shinseki*, 485 F. App'x 941, 947 (10th Cir. 2012) (finding the plaintiff's discrimination claim fails whether considered at the prima facie stage or for lack of pretext where she "presented no evidence that [the person] who made the [discriminatory] statement. . . was involved in the decision to terminate her."); *Hare v. Denver Merch. Mart, Inc.*, 255 F. App'x 298, 303 (10th Cir. 2007) ("[T]o support . . . an inference of discriminatory intent, the plaintiff must demonstrate a nexus between the actions or remarks and the decision to terminate. To show a nexus, the remarks must be made by someone involved in the decision to terminate the plaintiff.).[22] Ms. Solomon likewise offers no argument or evidence that would suggest her disability was a "determining factor" in any decision or action by

---

[22] Ms. Solomon does not address any of the other ways to establish an inference of discrimination, such as preferential treatment given to employees outside the protected class, timing or sequence of events, or that she was terminated and replaced by another employee. *See Barlow*, 703 F.3d at 505 (citations omitted). And she does not argue or offer evidence in support of a "cat's paw" theory. *See* n. 24, *infra*.

the Secretary. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018) ("[T]he inference of discrimination element of the prima facie case 'requires the plaintiff to present some affirmative evidence that disability was a *determining factor* in the employer's decision.'" (quoting *Morgan*, 108 F.3d at 1323)).

Most importantly, however, even if the Court were to assume Ms. Solomon had set forth a prima facie case of race or disability discrimination, the Secretary would be entitled to summary judgment because Ms. Solomon makes no effort whatsoever to show pretext.[23]  *See* Resp. [Doc. No. 65] at 36-41.  Indeed, Ms. Solomon never even addresses pretext except in stating that she is not required to identify comparator employees who were treated differently.  *See id.* at 39.  This comes nowhere close to meeting her burden.  *See DePaula*, 859 F.3d at 970 ("To survive a motion for summary judgment . . . the plaintiff must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual."); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 529 (10th Cir. 1994) ("Failure to come forward with evidence of pretext will entitle the defendant to judgment."); *Bekkem*, 915 F.3d at 1267 ("Mere conjecture that the employer's explanation is pretext[ual]" cannot defeat summary judgment. (quoting *Morgan*, 108 F.3d at 1323)).

---

[23] Although not disputed by Ms. Solomon, the Secretary has shown that he possessed legitimate, nondiscriminatory reasons for her termination and other actions.  *See* Mot. [Doc. No. 54] at 40-42. The Secretary terminated Ms. Solomon's employment based on failure to follow instructions, absence without leave, lack of candor, and conduct unbecoming of a federal employee.  And each action regarding leave or telework involved input by multiple OKC VA employees and was consistent with the applicable OKC VA policy and guidance at the time.

Notwithstanding Ms. Solomon's failure to argue pretext, the Court notes that nothing in evidence properly set forth suggests that the reasons behind any decision or action by the Secretary were pretextual. As to her termination, there is no evidence in the record from which a juror could infer that the four charges set forth by Associate Director Gregory were a pretext for an underlying desire to fire Ms. Solomon based on her race or disability—particularly where the only evidence of discrimination is the comments four months prior by Mr. Scott, who was not involved in her removal. *See Cone*, 14 F.3d at 531 (Discriminatory "comments by non-decisionmakers are not material" to show an employer's action was based on discrimination); *see also Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1184 (10th Cir. 2006) (finding a discriminatory remark by a supervisor did not suggest pretext where "[t]he remark was made by only one of the four individuals that decided to terminate [the plaintiff], and no overt racial animus is attributed to any of the other decisionmakers.").[24]

Ms. Solomon briefly disputes the factual basis behind one or more—but not all—of her removal charges. *See* Resp. [Doc. No. 65] at 38. But she offers no evidence in support of her contentions, let alone any evidence that the decisionmakers knew about any of the circumstances she references. *See id.*; *see also Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) ("[I]t is not what [a

---

[24] As noted, Ms. Solomon does not assert a "cat's paw" theory that applies where a biased subordinate who lacks decision-making authority uses the formal decision maker "as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca–Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 487 (2006). In any event, there is no evidence to suggest that occurred here.

decisionmaker] *should* have known that matters, but whether he acted in good faith upon the beliefs he held"). Moreover, Ms. Solomon's argument regarding the Lack of Candor charge does not challenge or otherwise relate to the factual basis for that charge: her posting live videos on Facebook showing her in public and wearing a mask, despite stating in her accommodation request that she is restricted from being in public and cannot wear personal protective equipment. *Compare* Resp. [Doc. No. 65] at 38; *with* Removal Proposal [Doc. No. 54-6] at 72.[25]

As to leave and telework, the evidence properly before the Court shows that numerous individuals involved acted consistent with applicable OKC VA policy. There is no dispute that Mr. Scott worked with Ms. Solomon to complete her telework request and was ultimately able to get her approved on March 26, 2020, two days after her position became eligible. Although she was charged for time off prior to that, she does not dispute that her leave was correctly categorized by Mr. Scott, Ms. Myers, Ms. Harmon, and Associate Director Gregory.

Mr. Scott also recommended Ms. Solomon as a candidate for a reasonable accommodation. Ms. Craft, Ms. Dirden, and Mr. Scott worked with Ms. Solomon toward processing her reasonable accommodation request. Ms. Solomon never signed all the requisite forms that the OKC VA required from all employees, despite reminders

---

[25] Ms. Solomon even more passively references the Failure to Follow Instructions charge, stating only that "the instructions kept changing" without any elaboration or evidence. Resp. [Doc. No. 65] at 38. She also includes a few sentences about her social media posts that potentially relate to one or more charges, but she cites no evidence whatsoever. *See id.* None of this comes close to suggesting the reasons for her removal were pretextual.

from these individuals and Associate Director Gregory. Ultimately, Ms. Solomon has not shown any instance where she was wrongfully denied leave or permission to telework.

Ms. Solomon asserts that Mr. Scott: (1) "put up obstacles" to her obtaining an accommodation; (2) kept changing the requirements for telework; (3) repeatedly required her to submit the same forms; and (4) put up "road blocks" to her working remotely. Resp. [Doc. No. 65] at 38. But at no point in her Response does Ms. Solomon cite any evidence to support any of these contentions. As to the initial telework approval, it was Ms. Harmon rather than Mr. Scott who required execution of an ad hoc telework agreement, and there is no dispute Mr. Scott assisted Ms. Solomon in obtaining her approval within two days of her being eligible. As to the reasonable accommodation process, it was Ms. Dirden and Ms. Craft, rather than Mr. Scott, who required her to sign and complete the forms, as they did in every other reasonable accommodation case at the time. The mere fact that Ms. Solomon was required to sign another telework agreement in connection with the reasonable accommodation process does not give rise to an inference of discrimination or suggest pretext.[26]

At bottom, Ms. Solomon offers no evidence to suggest that the issues associated with her leave requests and telework were the product of anything other than the process required by the OKC VA and measures in place during the pandemic. She

---

[26] Ms. Solomon also asserts that Mr. Scott charged her "Away Without Leave" while she was working remotely and "others were allowed to telework without being made to jump through the same hoops. . ." *Id.* Like her other contentions, these assertions are not supported by references to any evidence. *See id.*

complains of actions taken by Mr. Scott, but he was not the decisionmaker for any of the telework requirements she references. Accordingly, Ms. Solomon has not shown that the proffered reasons for the Secretary's actions were pretextual.

For all these reasons, the Secretary is entitled to summary judgment on Ms. Solomon's claims of race and disability discrimination.

### C. Failure to Accommodate

Under "Count Two" in her Amended Complaint, Ms. Solomon asserted claims for disability discrimination and failure to accommodate in violation of the Rehabilitation Act. *See* [Doc. No. 7] at 15. However, Ms. Solomon did not respond in any way to the Secretary's argument on failure to accommodate. *See* Resp. [Doc. No. 65] at 27-41. Accordingly, Ms. Solomon has abandoned her claim for failure to accommodate, and summary judgment is warranted. *See Hinsdale v. City of Liberal*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming the district court's decision to conclude claims were abandoned when they were not addressed in the plaintiff's summary judgment response); *see also Kimbro v. Oklahoma ex rel. Oklahoma House of Representatives*, No. CIV-22-1003-PRW, 2025 WL 223780, at *6 (W.D. Okla. Jan. 16, 2025) (finding a claim abandoned when the party failed to present evidence or discuss the claim in her response); *Stephens v. BMAG Mgmt. Co., LLC*, No. CIV-20-00306-JD, 2023 WL 5538304, at *12-13 (W.D. Okla. Aug. 28, 2023) (same).

In any event, the Court agrees with the Secretary that this claim is without merit because the OKC VA offered Ms. Solomon a reasonable accommodation for telework. As to any claim regarding reassignment, Ms. Solomon has made no effort to show that

there was another position to which the Secretary could have reassigned her. *See Duvall v. Georgia-Pac. Consumer Prods., L.P.*, 607 F.3d 1255, 1263 (10th Cir. 2010) ("[A]t the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation."); *Taylor v. Pepsi–Cola Co.*, 196 F.3d 1106, 1110 (10th Cir.1999) ("To survive summary judgment, Plaintiff must establish that [s]he was qualified to perform an appropriate vacant job which [s]he must specifically identify and show was available within the company at or about the time [s]he requested reassignment."). For all these reasons, the Secretary is entitled to summary judgment on Ms. Solomon's reasonable accommodation claim.

## V.    Conclusion

For all the reasons set forth above, the Secretary's Motion for Summary Judgment [Doc. No. 54] is GRANTED. A separate judgment of dismissal shall be entered contemporaneously with this Order.

IT IS SO ORDERED this 3rd day of September, 2025.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE